JUDGE GRIESA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13  CV  2913

---

DALILA BEN-DAVID AND PAUL BEN-DAVID,

Plaintiffs,

- against -

THE CITY OF NEW YORK, POLICE OFFICER
WHITTAKER YOUNG, POLICE SERGEANT
VINCENT RANIERI, POLICE OFFICER JOHN
DOES 1-20, and SUPERVISORY POLICE
OFFICERS RICHARD ROES 1-20, each in their
individual and official capacities,

Defendants.

---

Civil Action No.

**COMPLAINT**

Jury Trial Demanded

RECEIVED
MAY 0 1 2013
S.D.N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      This is a civil action seeking damages against Defendants for committing acts, under color of law, which deprived Plaintiffs of rights secured under the Constitution and laws of the United States and the State of New York; for conspiring for the purpose of impeding and hindering the due course of justice, with intent to deny Plaintiffs of the equal protection of laws; and for refusing or neglecting to prevent such deprivations and denials to Plaintiffs.

2.      Plaintiff DALILA BEN-DAVID's rights were violated when an officer of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unjustly slammed her face and torso against the hood of a police car, causing her to suffer multiple physical injuries including but not limited to substantial bruising to her face and persistent and recurring headaches.

3.      Plaintiff PAUL BEN-DAVID's rights were violated when officers of the NYPD unjustly assaulted him, causing him to suffer multiple physical injuries, including but not limited to injuries to his shoulder and back.

4.      Plaintiffs' rights were further violated when they were arrested, incarcerated, and

charged with crimes that were without basis in fact. Those criminal charges were dismissed by on January 31, 2013.

## JURISDICTION AND VENUE

5.    This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

6.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

7.    An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

8.    Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that, *inter alia*, the events giving rise to the claim occurred in the Southern District of New York.

## SUPPLEMENTAL JURISDICTION

9.    This Court has supplemental jurisdiction over Plaintiffs' state claims herein under the Constitution and Laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

10.    Pursuant to New York State General Municipal Law § 50-e, Plaintiffs timely filed Notices of Claim with the New York City Comptroller within ninety (90) days of the events herein complained of, and the Comptroller designated the claims as numbers 2012-PI-020992 (Dalila Ben-David) and 2012-PI-020993 (Paul Ben-David).

11.    More than thirty (30) days have elapsed since service of said notice of claim and adjustment or payment of the claims has been neglected or refused by Defendant THE CITY OF NEW YORK (the "CITY").

2

12.     This action is commenced within one (1) year and ninety (90) days after the happening of the events upon which these claims arise.

13.     Defendant CITY conducted the examinations of Plaintiffs pursuant to New York State General Municipal Law § 50-h on February 21, 2013.

## JURY TRIAL DEMANDED

14.     Plaintiffs demand a trial by jury on each and every one of the claims pled herein.

## PARTIES

15.     Plaintiffs DALILA BEN-DAVID (hereinafter "Dalila") and PAUL BEN-DAVID (hereinafter "Paul") are married to one another and were at all relevant times residents of the nation of France.

16.     Defendant CITY is a municipal corporation duly organized and existing by virtue of the laws of the State of New York.

17.     The New York City Police Department ("NYPD") is the department of the Defendant CITY responsible for, among other things, arresting persons for offenses and maintaining custody over such persons prior to their initial appearance in court. At all times relevant hereto, the NYPD, together with the Defendant CITY, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel.  In addition, at all relevant times, the NYPD, together with the Defendant CITY, was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obeyed the constitutions and laws of the United States and of the State of New York.

18.     In addition to the facts alleged in the following paragraphs, all individual Defendants are sued in their individual and official capacities and all acted within the scope of

their employment and under color of state law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or Defendant CITY.

19.     At all relevant times herein, Defendant POLICE OFFICER WHITTAKER YOUNG (hereinafter "YOUNG") was a police officer employed by the NYPD and was acting in the capacity of agent, servant, and employee of the Defendant CITY.

20.     At all relevant times herein, Defendant POLICE SERGEANT VINCENT RANIERI (hereinafter "RANIERI") was a police sergeant employed by the NYPD and was acting in the capacity of agent, servant, and employee of the Defendant CITY.

21.     The true names of Defendants POLICE OFFICERS JOHN DOES 1-20 and SUPERVISORY OFFICERS RICHARD ROES 1-20 are not currently known to Plaintiff. However, all of said Defendants are employees or agents of the NYPD. Accordingly, said Defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York General Obligations Law § 50-k. The Law Department, then is hereby put on notice (a) that Plaintiff intends to name said officers as Defendants in an amended pleading once the true names of said Defendants become known to Plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

22.     Joinder of Plaintiffs' claims is proper pursuant to Federal Rule of Civil Procedure 20(a) in that Plaintiffs' claims arise out of the same occurrence, described infra, and their claims contain numerous common questions of law and fact.

### THE BEATINGS AND FALSE ARRESTS OF PLAINTIFFS

23.     On May 26, 2012, Plaintiffs were in New York City for Paul to attend an annual conference of physicians belonging to the Association Benbeurian. The Association Benbeurian

is an interfaith association of medical doctors committed to staying current with the latest advances in medical care and Paul is the secretary of said organization.

24.     That evening, Plaintiffs went to dinner at Boom restaurant in Soho (located at 152 Spring Street in Manhattan) with French friends that were visiting New York City for the same reason. That group of friends included seven medical doctors and the spouses of four of those doctors. Thus, including Plaintiffs, their group at dinner consisted of thirteen people; most were highly educated professionals and none of them had any criminal records of any sort in this country or any other.

25.     At one point that evening, Plaintiffs and a few other members of the group went outside to the front of the restaurant to enjoy some fresh air. After a short period of time they came back inside and went to their tables. As they were doing so, a muscular white male ("JOHN DOE #1") hurled obscenities at Dalila, including, specifically, "Fuck French." This rude and obscene individual was wearing civilian clothes and was not displaying a police badge or any other police indicia.[1]

26.     Paul overheard these obscene insults and asked JOHN DOE #1 to refrain from speaking to his wife in this manner. In response, JOHN DOE #1 challenged Paul to fight him outside. Paul attempted to walk away but JOHN DOE #1 forcefully grabbed him and wrenched his arm, causing an injury to Paul's shoulder. Paul then attempted to free himself from this grip and several of his friends attempted to intervene so as to protect Paul from what they perceived to be an assault by a crazed and/or intoxicated civilian. JOHN DOE #1 then pulled out a hidden firearm and pointed it at Plaintiffs and their friends, causing great alarm and pandemonium in the restaurant as he had yet to identify himself as a police officer. At about the same time, another

[1] Based upon the criminal court documents in this matter, John Doe #1 was likely Sergeant Vincent Ranieri.

[2] Based upon the criminal court documents in this matter, John Doe #2 was probably Police

individual in civilian clothes ("JOHN DOE #2") sprayed mace in Paul's eyes without having previously identified himself as a police officer.[2]

27.     The men that had assaulted Paul and sprayed him with mace subsequently identified themselves as police officers. Upon discovering that these individuals that had assaulted him and sprayed him with mace were in fact police officers, Paul complied with their instructions and did not physically resist them in any way. The officer that sprayed Paul with mace – JOHN DOE #2 – then handcuffed him and told him "Fuck the French." Paul was then taken by officers to a police car outside on the street and placed in the back seat.

28.     Additional police officers arrived at the restaurant, and as Paul was sitting in the back seat of the police car near the restaurant, his wife, Dalila, went outside with several of her friends to watch what was happening and inquire as to where the police intended to take Paul. As Dalila was asking a police officer where Paul would be taken, JOHN DOE #1 forcefully grabbed Dalila from behind and roughly marched her to the hood of a nearby police car. There, in full view of numerous civilian witnesses, JOHN DOE #1 smashed Dalila's face twice against the hood of the car, causing her to suffer serious contusions, bruising, swelling, and physical pain.

29.     Paul watched this horrifying assault upon his wife from a short distance away, and was powerless to help her as he was handcuffed in the back seat of a nearby police car. Many of Plaintiffs' friends at the restaurant were standing outside and also observed this brazen and unjustified assault of Dalila, who had committed no crime nor given this police officer any reason to use physical force of any kind upon her, let alone assault her like a common thug.

30.     Dalila is a petite woman and the individual that assaulted her – JOHN DOE #1 – was a muscular man of significantly greater size.

---

[2] Based upon the criminal court documents in this matter, John Doe #2 was probably Police Officer Whittaker Young.

6

31.     Numerous other officers of the police department were standing in close proximity to the assault of Dalila and were in positions from which they could easily view their fellow officer smashing Dalila's face twice against the hood of the police car, but none of those officers intervened in any way to prevent the assault from happening nor attempted to prevent any further violations of her constitutional rights.

32.     After battering her in this above-described manner, JOHN DOE #1 handcuffed Dalila and locked her into the back of another police car. She was not taken to the hospital or offered any medical treatment for her injuries, which were immediately and readily apparent.

33.     JOHN DOE #1 and JOHN DOE #2 then sat in the front seats of the police car in which he was seated, and JOHN DOE #2 again looked Paul in the eye and said, "Fuck the French."

34.     From the restaurant, Plaintiffs were transported by police car to the First Precinct station house in Manhattan. They were then held in custody against their will for a period of approximately eight hours.  From there, Plaintiffs were transported by members of the NYPD to Central Booking located at 100 Centre Street in Manhattan, where they were held against their will for a period of approximately fifteen additional hours before their arraignment on criminal charges in Manhattan criminal court. They were both finally released from custody by the arraignment judge (on their own recognizance) after having spent in total almost twenty-four hours in custody against their will.

### THE CRIMINAL PROCEEDINGS AGAINST PLAINTIFF

35.     Next, the Defendants conspired to shield themselves from liability, embarrassment, and charges of misconduct by wrongfully and falsely convincing the New York County District Attorney's Office that there was at least reasonable cause to believe that

Plaintiffs were guilty of crimes associated with the beating, and that Plaintiffs had used physical force against police officers.

36.     To that end, on May 27, 2012, Defendant YOUNG attested to a misdemeanor complaint filed in New York County Criminal Court charging Plaintiff Dalila Ben-David with one count of Obstruction of Governmental Administration in the Second Degree (Penal Law Section 195.05) and one count of Disorderly Conduct (Penal Law Section 240.20), and said complaint contained false information that YOUNG knew to be false.

37.     On that same date, YOUNG also attested to a misdemeanor complaint filed in New York County Criminal Court charging Plaintiff Paul Ben-David with one count each of Assault in the Third Degree (Penal Law Section 120.00[1]), Assault in the Third Degree (Penal Law Section 120.00[2]), Harassment in the Second Degree (Penal Law Section 240.26), and Disorderly Conduct (Penal Law Section 240.20). Said complaint contained false information supplied by RANIERI, and YOUNG knew said information to be false.

38.     Following Plaintiffs' arraignments, the New York County District Attorney's Office subsequently moved for adjournments in contemplation of dismissal with respect to both criminal matters, and the cases against Plaintiffs were ultimately dismissed and sealed on January 31, 2013.

## PLAINTIFF'S INJURIES SUSTAINED AS A RESULT OF THE BEATING

39.     As a result of the aforementioned police beating, Dalila has suffered numerous permanent physical injuries, emotional and psychological damage, and will require medical care, medication, and therapy for the foreseeable future on account of the injuries she sustained.

40.     Said injuries to Dalila, include, *inter alia*, significant bruising about the face and eyes, severe pain and distress, persistent and recurring headaches, psychological and emotional

damage, and anxiety.

41.     As a result of the aforementioned beating, Paul suffered ligament damage in his shoulder, pain in his back, pain in his eyes, psychological and emotional damage, and anxiety.

42.     Furthermore, Paul was unable to work for approximately one month as a result of his shoulder injuries, and lost approximately one month's income as a result.  He also incurred significant expenses in connection with medical and psychological care for himself and his wife, as well as significant legal bills as a result of his false arrest.

## CLAIMS FOR RELIEF

## COUNT I

## (42 U.S.C. § 1983 – Police Brutality)

43.     Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

44.     Defendants   RANIERI   and   YOUNG   (hereinafter   the   "ARRESTING OFFICERS"), under the color of state law and within the scope of their authority, assaulted and battered the Plaintiffs in violation of the civil rights of the Plaintiffs, more particularly, 42 U.S.C. § 1983 as well as other applicable federal and state laws, including the Fourth and Fourteenth Amendments to the United States Constitution.

45.     The deprivation by the Defendants of Plaintiffs' civil rights was a result of the ARRESTING OFFICERS acting under color of state law and within their authority as law enforcement officers within the employ of the Defendant CITY and the NYPD.

46.     The ARRESTING OFFICERS conspired with one another as well as with POLICE OFFICERS JOHN DOE 1-20 and SUPERVISORY OFFICERS RICHARD ROE 1-20, to cover up the wrongful nature of the beating of Plaintiffs and fabricated a version of events

leading up to and resulting in the beating of the Plaintiffs. Said conspiracy worked to deprive Plaintiffs of their constitutional rights, including the rights to be free from the intentional use of unreasonable force, to be free from unreasonable search and seizure, and unreasonable and excessive force.

47.    The Defendants, including but not limited to the ARRESTING OFFICERS, POLICE OFFICERS JOHN DOE 1-20 and SUPERVISORY OFFICERS RICHARD ROE 1-20 were not acting with immunity when they deprived the Plaintiffs of their civil rights.

48.    At no time during the events described above or as the events occurred did the Defendant officers have probable cause to viciously strike or beat Plaintiffs.

49.    At no time, either at the time and place of the police beating or at any later time and place, did Plaintiffs attempt to offer violence to any of the Defendant officers.

50.    The aforementioned beating was done knowingly, intentionally and willfully.

51.    The aforementioned beating was done negligently and recklessly.

52.    The aforementioned beating was done without reason or provocation.

53.    By reason of said striking and beating, Plaintiffs were caused to suffer severe physical injuries, including pain and suffering, emotional and psychological distress and horror.

## COUNT II

### (42 U.S.C. § 1983 – Monell claim)

54.    Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

55.    All of the acts and omissions by the ARRESTING OFFICERS, POLICE OFFICERS JOHN DOE 1-20 and SUPERVISING OFFICERS RICHARD ROE 1-20 (hereinafter the "INDIVIDUAL POLICE DEFENDANTS") described above were carried out

pursuant to overlapping policies and practices of the Defendant CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant CITY, and its agency the NYPD.

56.     Defendant CITY and the NYPD, by their other policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

57.     The acts complained of were carried out by the INDIVIDUAL POLICE DEFENDANTS in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the Defendant CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

58.     The aforementioned customs, practices, procedures and rules of the Defendant CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a.   Fabricating evidence in order to justify (or attempt to justify) otherwise suspicion-less arrests;

b.   Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

c.   Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

d.   Retaliating against officers who report police misconduct; and

e.   Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the

NYPD.

59.     The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the Defendant CITY:

a.   *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

b.   *Taylor-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

c.   *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the Defendant CITY's motion to dismiss on *Iqbal/Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

d.   *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct,

*to wit*, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[3]

e.  *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest Plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

f.  *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

g.  *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

h.  *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

i.  *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

---

[3] For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

j.  *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

k.  *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

l.  *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

m.  *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

n.  *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

o.  *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

p.  *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD BEATING death of Amadou Diallo);

14

q.  *White-Ruiz v. The City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

r.  *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

s.  *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her).

60.  The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct, are further evidenced, *inter alia*, by the following:

a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the

Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[4]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread [...] custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[5]

d. Defendant CITY's tacit condoning of and failure to supervise, discipline or provide remedial training when officers engage in excessive force is evidenced by its systematic disregard of the recommendations of the Civilian Complaint Review Board ("CCRB"). CCRB is a Defendant CITY agency, allegedly independent of the NYPD that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[6] When it does, however, Police Commissioner Ray Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the

---

[4] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[5] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[6] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom the CCRB found to have engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[7] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[8]

   e.   Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month and for pushing officers to falsify official documents. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and

---

[7] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[8] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

Schuylerville and taped by a 911 dispatcher.[9]

61.     The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence, are further evidenced, *inter alia*, by the following:

a.     The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[10]
>
> [...]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[11]

b.     In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was

---

[9] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

[10] Mollen Commission Report, p. 36.

[11] Mollen Commission Report, pp. 40-41.

released.[12] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.
>
> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[13]

    c.   In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of criminal charges in connection with those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[14]

---

[12] Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4Ndeqcl.

[13] *Id.*

[14] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

d. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested

and falsely swore out charges against an undercover officer from the Internal Affairs

Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told
> to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found
> that he was carrying packs of knock-off smokes.
>
> [Sgt. John] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that
> they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover
> corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not
> tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the
> pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from
> headquarters," a police source told The Post.[15]

The officers were indicted for felony perjury, filing a false report and filing a false

instrument.[16]

e. In early 2010, the Defendant CITY settled a civil rights lawsuit wherein one

Officer Sean Spencer[17] falsely arrested and accused a 41-year old grandmother of

prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen,

the attorney representing the Defendant CITY in the case, admitted: "Officer Spencer

falsely reported to the assistant District Attorney that he saw [the Plaintiff] beckon to

---

[15] Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, available at
http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyltuTeLedhKWtruJZYsdL.

[16] John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus
charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-
30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[17] In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John
Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January
7, 2010, *available at* http://articles.nydailynews.com/2010-01-08/local/17943916_1_prostitution-charges-arrested

three male passersby and that he was aware that Plaintiff was previously arrested for [prostitution] when the Plaintiff had never been arrested for this offense." According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[18]

    f.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[19]

62.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidenced, *inter alia*, by the following:

    a.   Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b.   In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State

---

[18] *Id.*

[19] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

63.   The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the Defendant CITY.

64.   The aforementioned actions of the INDIVIDUAL POLICE DEFENDANTS resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the Defendant CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

65.   All of the foregoing acts by Defendants deprived Plaintiffs of federally protected

rights, including, but limited to, the right:

      a.  Freedom from unreasonable searches and seizures of his person;

      b.  Freedom from arrest without probable cause;

      c.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Plaintiff was aware and did not consent;

      d.  Freedom from deprivation of liberty without due process of law; and

      e.  The enjoyment of equal protection, privileges and immunities under the laws.

66.    Defendant CITY knew or should have known that the acts alleged herein would deprive Plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

67.    Defendant CITY is directly liable and responsible for the acts of the INDIVIDUAL POLICE DEFENDANTS because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the Defendant CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

68.    Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and Defendant CITY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said

policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

69.     The aforementioned Defendant CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned Defendant CITY policies, practices and/or customs, the INDIVIDUAL POLICE DEFENDANTS felt empowered to exercise unreasonable and wholly unprovoked force against Plaintiffs and arrest Plaintiffs without probable cause. Pursuant to the aforementioned Defendant CITY policies, practices and/or customs, the INDIVIDUAL POLICE DEFENDANTS failed to intervene in or report other Defendants' violation of Plaintiffs' rights.

70.     Plaintiffs' injuries were a direct and proximate result of the Defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the Defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

71.     The actions of the INDIVIDUAL POLICE DEFENDANTS resulted from and were taken pursuant to the foregoing *de facto* policies and/or well-settled and widespread customs and practices of the Defendant CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

72.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the Plaintiffs' constitutional rights.

73.     As a direct and proximate cause of the acts of all Defendants as set forth above, Plaintiffs suffered physical injury, loss of income, medical expenses, and severe mental anguish

in connection with the deprivation of this constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT III

### (42 U.S.C. §§ 1983, 1986 – Failure to Intervene)

74.     Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

75.     Each of the Defendants had knowledge of the conspiracy to arrest, harm, and wrongfully deprived Plaintiffs of their constitutional and statutory rights as set forth above and below.

76.     Each of the Defendants, through the exercise of reasonable diligence, had the power to prevent or aid in preventing such deprivation.

77.     Each of the Defendants neglected or refused to prevent such deprivation.

78.     As a direct and proximate cause of the acts of each of the Defendants as set forth above, Plaintiffs suffered physical injuries, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT IV

### (42 U.S.C. §§ 1985 – Conspiracy to Interfere with Civil Rights)

79.     Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

80.     Each of the Defendants conspired for the purpose of depriving Plaintiffs the equal protection of the laws.

81.     Each of the Defendants took an act in furtherance of the object of said conspiracy.

82.     As a direct and proximate cause of the acts of all Defendants as set forth above, Plaintiffs suffered physical injuries, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT V

## (False Arrest & Imprisonment – 42 U.S.C. § 1983)

83.     Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

84.     There was no warrants for Plaintiffs' arrests. The arrest was without reasonable grounds to believe that plaintiffs had committed criminal offenses, and each of the defendants who participated in the arrest and detention process knew they were without probable cause to arrest Plaintiffs.

85.     At no time during the events described above or as the events occurred did the defendant officers have probable cause for the arrest of Plaintiffs, and there was no legal cause or excuse for their seizure.

86.     Following their arrests, Plaintiffs were handcuffed and their persons were by Defendants against their will and without their consent and without probable cause to believe that either had committed a criminal offense.

87.     Plaintiffs were subsequently unlawfully detained at a police precinct for several hours before being delivered to Central Booking below 100 Centre Street, where they remained confined until they were arraigned approximately twenty-four hours after their wrongful arrests.

88.     As a result of their concerted, unlawful and malicious arrest of plaintiffs, each of the defendants, acting under color of law and within the scope of their authority, deprived the Plaintiffs of their liberty without due process of law and deprived them of equal protection of laws, in violation of Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

<u>**COUNT VI**</u>

**<u>(42 U.S.C. § 1983 - Malicious Prosecution)</u>**

89.     The ARRESTING OFFICERS arrested Plaintiffs and falsely charged them with various misdemeanor crimes in order to cover up their unlawful assaulting of the Plaintiffs and justify their illegal misconduct.

90.     The ARRESTING OFFICERS intentionally and recklessly perpetuated falsehoods associated with Plaintiffs' arrest by informing prosecutors at the New York County District Attorney's Office that Plaintiffs had done things that they had not in fact done and thus were guilty of crimes that they had not in fact committed. Specifically, they accused Paul of having assaulted RANIERI and Dalila of having intentionally interfered with the arrest of Paul.

91.     Defendant YOUNG further knowingly perpetuated these falsehoods by swearing to criminal court complaints that he knew contained false information about Plaintiffs' conduct prior to their arrests.

92.     Following their arraignments in criminal court, the ARRESTING OFFICERS continued to maintain – in their discussions with prosecutors responsible for investigating the

cases – the same falsehoods described in the criminal court complaints filed against Plaintiffs.

93.    As a result of their concerted, continuing, unlawful and malicious prosecution of the plaintiff, the ARRESTING OFFICERS intentionally, or with deliberate indifference and callous disregard of plaintiff's rights, deprived plaintiff of his liberty without due process of law and deprived him of equal protection of the laws, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

## COUNT VII

### (42 U.S.C. § 1983 – Right to a Fair Trial)

94.    Plaintiff repeats and re-alleges each and every allegation set for in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

95.    On or about May 27, 2012, Defendant YOUNG falsely told prosecutors at the New York County District Attorney's Office that on May 26, 2012, at about 11:30 pm, YOUNG observed Dalila "interfere with the official public function of police officers," in that she was allegedly "pulling [Paul] away from YOUNG and other officers, while yelling and screaming." YOUNG further falsely stated that said acts "caused a public inconvenience/disturbance."

96.    On or about May 27, 2012, Defendant YOUNG falsely told prosecutors at the New York County District Attorney's Office that on May 26, 2012, at about 11:30 pm, YOUNG observed Paul "punch [Defendant YOUNG] several times in the face with a closed fist."

97.    On or about June 7, 2012, Defendant RANIERI falsely told prosecutors that he observed Paul punch RANIERI several times in the face.

98.    These aforementioned statements by YOUNG and RANIERI to the prosecutors were knowingly and deliberately false and would have likely influenced a criminal jury or grand jury in its determination of Plaintiffs' guilt of charges such as Assault in the Third Degree or

Obstruction of Government Administration.

99.     As a result of their false statements to the prosecutors investigating this matter, defendant ARRESTING OFFICERS and JOHN DOES 1-20 and RICHARD ROES 1-20 intentionally, or with deliberate indifference and callous disregard of Plaintiffs' rights, deprived Plaintiffs of their liberty without due process of law and deprived them of equal protection of the laws, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

<h3 align="center"><u>COUNT VIII</u></h3>

<h3 align="center"><u>(New York Constitution Article I)</u></h3>

100.     Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

101.     By the aforesaid acts, Defendants have violated Plaintiffs' rights to the equal protection laws under Article I, 11 of the New York State Constitution, thereby giving rise to causes of action pursuant to that article.

102.     The conduct and actions of the each of the Defendants, acting under color of state law, in arresting, imprisoning, assaulting, battering, and using excessive force against Plaintiffs were done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of their acts, without lawful justification, and were designed to and did cause specific and serious bodily injury, mental and emotional harm, and pain and suffering in violation of the Plaintiffs' constitutional rights as guaranteed under the laws and Constitution of the State of New York. As a result of said actions, Plaintiffs were deprived of such rights, including, but not limited to, rights under Article I, 8-9 of the New York State Constitution guaranteeing freedom of expression and association, Article I, 12, guaranteeing protection

## COUNT X

### (Negligence)

108.   Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

109.   The Defendants, including but not limited to the ARRESTING OFFICERS and other officers that failed to intervene, owed Plaintiffs a duty of reasonable care.

110.   However, the negligent acts complained of by Plaintiffs and committed by Defendants seriously endangered Plaintiffs' physical safeties and were obviously likely to cause severe emotional injury to Plaintiffs.

111.   Moreover, the negligent acts complained of by Plaintiffs and committed by Defendants amounted to outrageous conduct that cannot be tolerated in a civilized community.

112.   Each of the Defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the Plaintiffs. The acts and conduct of the Defendants were the direct and proximate cause of the injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

113.   As a result of the foregoing, the Plaintiffs were deprived of their liberty, suffered specific and serious bodily injuries, pain and suffering, psychological and emotional injuries, costs and expenses, and were otherwise damaged and injured.

114.   For all claims under New York State Law, Defendants are jointly and severally liable to Plaintiffs inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

31

## COUNT XI

### (Negligent Hiring and Retention)

115.    Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

116.    The Defendant CITY and NYPD did not exercise reasonable care and diligence in the selection, engagement, employment and training of its agents, servants, and employees and were negligent in the hiring, training and retention of the INDIVIDUAL POLICE DEFENDANTS, so as to cause serious physical injury to Plaintiffs.

117.    Such negligence consisted of negligence in training, hiring, supervision and retention of the INDIVIDUAL POLICE DEFENDANTS involved in this incident; in failing to observe the existing police department protocols for police officers/detectives designed to govern the use of deadly lethal force causing the serious injuries both physical and emotional resulting in serious and permanent physical injury and discrimination arising and resulting out of the aforementioned wrongful beating of the Plaintiffs and further, deprived Plaintiffs' civil rights, privileges and immunities secured under the Constitutions of the United States of America and State of New York; failing to properly investigate their background; failing to properly train and instruct police officers/detectives, especially regarding the abuse of power while in the field; failing to give police officers/detectives proper instructions on the use of force; improperly supervising police officers/detectives in the field, including the police officers/detectives as well as in the staffing, administration and processing of persons suspected of violation of the criminal laws of the State of New York which allowed the beating of the Plaintiffs, which resulted in the serious and permanent physical injuries Plaintiffs sustained.

118.    The Defendant CITY and NYPD, through their agents, servants, employees,

including but not limited to the ARRESTING OFFICERS were negligent, reckless and careless in beating the Plaintiffs.

119.    The Defendant CITY and NYPD had prior knowledge of the inappropriate, unlawful, and improper conduct of the INDIVIDUAL POLICE DEFENDANTS, and continued to employ them and allowed them to be in contact with the public at large.

120.    For all claims under New York State Law, Defendants are jointly and severally liable to Plaintiffs inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT XII

### (Intentional Infliction of Emotional Distress)

121.    Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

122.    The intentional acts complained of by Plaintiffs and committed by the Defendants amount to extreme and outrageous conduct that cannot be tolerated in a civilized community.

123.    The intentional acts complained of by Plaintiffs and committed by the Defendants were plainly likely to cause extreme emotional distress to Plaintiffs.

124.    As a result of the foregoing acts by Defendants, the Plaintiffs were deprived of their liberty, suffered specific and serious bodily injuries, pain and suffering, psychological and emotional injuries, costs and expenses, and were otherwise damaged and injured.

125.    For all claims under New York State Law, Defendants are jointly and severally liable to Plaintiffs inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT XIII

### (Prima Facie Tort)

126.   Plaintiffs repeat and re-allege each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

127.   Defendants, including but not limited to the ARRESTING OFFICERS, intentionally caused physical and emotional injuries to Plaintiffs and had no excuse or justification for their actions.

128.   As a result of the foregoing, the Plaintiffs were deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

129.   For all claims under New York State Law, Defendants are jointly and severally liable to Plaintiffs inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

**WHEREFORE**, Plaintiffs DALILA BEN-DAVID and PAUL BEN-DAVID respectfully request judgment upon all causes of action against Defendants as follows:

1.   With respect to the Defendant CITY and the NYPD:

a.   Declaratory judgment declaring that Defendant CITY has violated the aforesaid statutes and constitutions.

b.   Restitution to Plaintiffs of their rights, privileges, benefits and income which would have been received by them but for the Defendants' unlawful, wrongful, tortuous, and unconstitutional conduct;

c.   Compensatory damages in an amount to be determined by the court and jury;

   d.  Punitive damages in the amount to be determined by the court and jury;

   e.  Reasonable attorney's fees, disbursements and costs of this action, pursuant to 42 U.S.C. § 1988;

   f.  All legal and statutory interest on sums awarded; and

   g.  Such other and further relief as this honorable court may deem just, proper and equitable.

2.      With respect to each of the INDIVIDUAL POLICE OFFICERS:

   a.  Declaratory judgment declaring that the Defendants have violated the aforesaid statues and constitutions;

   b.  Restitution to Plaintiffs of their rights, privileges, benefits and income which would have been received by them but for each Defendant's unlawful, wrongful, tortuous, and unconstitutional conduct;

   c.  Compensatory damages in an amount to be determined by the court and jury;

   d.  Punitive damages in an amount to be determined by the court and jury;

   e.  Reasonable attorney's fees, disbursements, and costs of this action, pursuant to 42 42 U.S.C. § 1988;

   f.  All legal and statutory interest on sums awarded; and

   g.  Such other and further relief as this honorable court may deem just, proper and equitable.

Dated: New York, New York         GALLUZZO & JOHNSON LLP
      April 18, 2012

                            By: _____
                              Matthew J. Galluzzo
                              matthew.galluzzo@gjllp.com
                              *Attorneys for Plaintiffs Dalila Ben-David and*

*Paul Ben-David*
48 Wall Street, 11th Floor
New York, New York 10005
Tel: (212) 918-4661
Fax: (646) 402-6429
www.gjllp.com